1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY WILLIS,               ) | CIV-F-04-6542 AWI WMW |
|          ) | |
|        **Plaintiff,**    ) | **ORDER RE: SUMMARY** |
|              ) | **JUDGMENT** |
|     **v.**                ) | |
|              ) | |
| JOSEPH MULLINS, et al.,   ) | |
|              ) | (Docs. 141, 142, 146, and 147) |
|          **Defendants.**   ) | |
| _____ ) | |

The Defendants in this case have made motions for summary judgment, or in the alternative, summary adjudication. Plaintiff opposes the motions.

## I. History

Gary Willis ("Plaintiff") was a registered occupant of the E-Z 8 Motel in Bakersfield, CA on March 27, 1996. Police received reports of heavy traffic from that room and were informed it was registered under Plaintiff's name. A Kern County Narcotics Enforcement Team consisting of four members (Bakersfield Police Officer Joseph Mullins; Bakersfield Police Officer Silvius; Kern County Deputy Sheriff Hood; and California State Parole Officer Diane Mora) were sent to investigate.[1] Defendant Mullins consulted a list of parolees generated by the California

---

[1]Officers Mullins and Silvius are employees of the City of Bakersfield. They are jointly (together with the City of Bakersfield itself) represented by counsel. Officer Mora is separately represented.

Department of Corrections and distributed to local police departments on a roughly monthly

basis ("Parole Roster").  He presented the Parole Roster to Defendant Mora; she confirmed the

Parole Roster indicated that Plaintiff was on parole and subject to search.  After announcing their

presence and entering the motel room, the officers found two individuals, Plaintiff and Kathleen

Moye, inside.  Also visible were a knife, a syringe, and a briefcase.  The officers announced the

commencement of a parole search.  Plaintiff informed Defendant Mullins he was no longer on

parole and provided his parole discharge papers.  Defendant Mora left to seek telephone

confirmation of Plaintiff's parole status.  In fact, Plaintiff had been discharged from parole nine

months prior.  While the call was taking place, Defendant Mullins detained Plaintiff outside the

room while Defendants Silvius and Hood talked with Ms. Moye inside the room.  Ms. Moye

admitted to recently using methamphetamine, stated that she put a speed pipe in the briefcase,

and consented to search of the briefcase.  Defendant Mullins brought Plaintiff back into the

room.  Defendants Mullins, Silvius, and Hood opened the briefcase.  Based on evidence found

within, Plaintiff was convicted of possession of methamphetamine for sale (Cal. Health & Safety

Code § 11378) and possession of narcotics paraphernalia (Cal. Health & Safety Code § 11364).

He ultimately served six years in state prison.

      Plaintiff had made a motion to suppress evidence, which the California trial court denied.

On appeal, the Fifth District Court of Appeal found the entry constitutionally invalid and the

good faith exception to the exclusionary rule inapplicable, but nonetheless affirmed the denial of

suppression based on the finding that the officers had sufficient probable cause to search the

briefcase based on Ms. Moye's statements to Defendant Silvius.  The Fifth District's rationale

was that the "freeze" in search was a reasonable response to the uncertainty concerning

Plaintiff's parole status.  People v. Willis, 71 Cal. App. 4th 530, 541 (Cal. Ct. App. 1999).  On

appeal, the attorney general conceded the Fifth District's rationale for denying the motion to

suppress was erroneous.  People v. Willis, 28 Cal. 4th 22, 25 (Cal. 2002).  The California

Supreme Court overturned Plaintiff's conviction on June 3, 2002, finding that evidence from the

search must be suppressed as the good faith exception did not apply.  People v. Willis, 28 Cal. 4th

22, 38 (Cal. 2002).   Plaintiff was released on August 31, 2002.  Plaintiff first filed this suit in the

1   Central District of California on May 3, 2004.  He filed his amended complaint (the operative

2   complaint) on September 16, 2004. Transferred File, Doc. 14.  The case was then transferred to

3   the Eastern District of California due to improper venue.

4          The amended complaint contained nine causes of action: (1) monetary relief under 42

5   U.S.C. § 1983 for violation of Fourth and Fourteenth Amendment rights; (2) monetary relief

6   under 42 U.S.C. § 1983 for conspiracy to commit count one; (3) monetary relief under 42 U.S.C.

7   § 1983 for a policy, practice, procedure, and custom of committing Fourth and Fourteenth

8   Amendment violations; (4) monetary relief under 42 U.S.C. § 1983 for the City's policy of

9   indemnifying police officers in civil rights cases; (5) declaratory relief under 28 U.S.C. § 2201

10  finding that there is a custom, pattern and practice of Fourth and Fourteenth Amendment

11  violations by police in California; (6) injunctive relief under 28 U.S.C. § 1651 preventing all

12  Defendants from engaging in violations of the Fourth and Fourteenth Amendment; (7) monetary

13  relief under RICO for loss of actual employment and employment opportunities; (8) monetary

14  relief for conspiracy to commit count seven; and (9) monetary relief under Cal. Civ. Code § 52.1

15  for violation of Fourth and Fourteenth Amendment rights. See Transferred File, Doc. 14.  As the

16  result of previous motions, claims three and nine were dismissed and the claims against the

17  officers are limited to their individual capacities. Docs. 33 and 136.  Defendant Hood has taken

18  no part in these various motions as he was not initially served with the complaint in this case.

19         At present, Defendant Mora and the Bakersfield Defendants have made separate motions

20  for summary judgment, or in the alternative, summary adjudication. Docs. 141 and 142.  Plaintiff

21  filed a single opposition to both. Doc. 148.  Simultaneously, Plaintiff asks for additional

22  discovery under Fed. R. Civ. Proc. 56(f) and Chuman certification. Docs. 146 and 147.

23

24                                     **II. Legal Standards**

25         Summary judgment is appropriate when it is demonstrated that there exists no genuine

26  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

27  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v.

28  Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710

**3**

1  (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th
2  Cir. 1984).

3       Under summary judgment practice, the moving party "always bears the initial
4  responsibility of informing the district court of the basis for its motion, and identifying those
5  portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,
6  together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue
7  of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), quoting Fed. R. Civ. Proc.
8  56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,
9  a summary judgment motion may properly be made in reliance solely on the pleadings,
10  depositions, answers to interrogatories, and admissions on file." <u>Celotex Corp. v. Catrett</u>, 477
11  U.S. 317, 323 (1986).  Indeed, summary judgment should be entered, after adequate time for
12  discovery and upon motion, against a party who fails to make a showing sufficient to establish
13  the existence of an element essential to that party's case, and on which that party will bear the
14  burden of proof at trial.  "[A] complete failure of proof concerning an essential element of the
15  nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>,
16  477 U.S. 317, 322 (1986).   In such a circumstance, summary judgment should be granted, "so
17  long as whatever is before the district court demonstrates that the standard for entry of summary
18  judgment, as set forth in Rule 56(c), is satisfied." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323
19  (1986).

20       If the moving party meets its initial responsibility, the burden then shifts to the opposing
21  party to establish that a genuine issue as to any material fact actually does exist. <u>Matsushita Elec.</u>
22  <u>Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>First Nat'l Bank of Arizona v. Cities</u>
23  <u>Serv. Co.</u>, 391 U.S. 253, 288-9 (1968); <u>Ruffin v. County of Los Angeles</u>, 607 F.2d 1276, 1280
24  (9th Cir. 1979).

25       In attempting to establish the existence of this factual dispute, the opposing party may not
26  rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of
27  specific facts in the form of affidavits, and/or admissible discovery material, in support of its
28  contention that the dispute exists. Rule 56(e); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,

1   475 U.S. 574, 586 n.11 (1986);  First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253,

2   289 (1968); Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must

3   demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

4   suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W.

5   Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that

6   the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

7   the nonmoving party, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-9 (1986); Wool v.

8   Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

9           In the endeavor to establish the existence of a factual dispute, the opposing party need not

10  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

11  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

12  trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 290 (1968); T.W. Elec.

13  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).  Thus, the

14  "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see

15  whether there is a genuine need for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

16  475 U.S. 574, 587 (1986), quoting Fed. R. Civ. Proc. 56(e) advisory committee's note on 1963

17  amendments; International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th

18  Cir. 1985).

19          In resolving the summary judgment motion, the court examines the pleadings,

20  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

21  any. Rule 56(c); Poller v. Columbia Broadcast System, 368 U.S. 464, 468 (1962); SEC v.

22  Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is

23  to be believed, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and all reasonable

24  inferences that may be drawn from the facts placed before the court must be drawn in favor of the

25  opposing party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986),

26  citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam); Abramson v.

27  University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn

28  out of the air, and it is the opposing party's obligation to produce a factual predicate from which

the inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-5 (E.D. Cal. 1985).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts....Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), citation omitted.

### III. Statement of Material Facts

**A. Bakersfield Defendants**

1. During the morning hours of March 27, 1996, plaintiff GARY WILLIS (hereinafter "plaintiff WILLIS") registered at an Easy 8 Motel in Bakersfield, California.

2. The motel clerk checked plaintiff WILLIS into Room 221.

3. Sometime later, Kathleen Moye joined Plaintiff WILLIS to stay with him at the motel room.

4. Plaintiff WILLIS later left Room 221 to complete some errands leaving Ms. Moye behind in the room alone.

5. Plaintiff WILLIS left Ms. Moye in their motel room with approximately two to three thousand dollars worth of hand made jewelry.

6. Ms. Moye made telephone calls from the motel room and accepted a visitor while plaintiff WILLIS was away.

7. The person who visited Ms. Moye purportedly brought her a set of scales, plastic bags, several

1  spoons, a small metal container with suspected methamphetamine, a blue plastic container with

2  approximately five grams of methamphetamine, marijuana, "speed pipes," one syringe containing

3  a small amount of brown fluid containing methamphetamine, and approximately twenty empty

4  syringes.

5

6  8. Upon plaintiff WILLIS' return to the motel room, Ms. Moye threw the drug related items into

7  a briefcase and locked it.

8

9  9. While working as part of the Kern County Narcotics Enforcement Team, defendant JOSEPH

10  MULLINS (hereinafter "defendant MULLINS") received a telephone call from an employee of

11  the Easy 8 Motel.

12

13  10. The motel employee advised defendant MULLINS of a high level of phone and foot traffic

14  involving room 221. The motel employee suspected that the room occupants were potentially

15  selling drugs from the room. The motel employee informed defendant MULLINS that motel

16  room, room 221, was registered to plaintiff WILLIS.

17          Disputed. The motel employee advised defendant Mullins only that he/she had noticed a

18  large amount of phone traffic at Room 221.

19

20  11. From defendant MULLINS' knowledge and experience, he understood that narcotics dealers

21  commonly conduct transactions at rented motel rooms in that particular area of Bakersfield,

22  particularly methamphetamine. Defendant MULLINS believed that the EZ 8 Motel was ideally

23  suited for this purpose because of the low room rate and its close proximity to the freeway.

24

25  12. Defendant MULLINS checked department records concerning plaintiff WILLIS and

26  discovered that he had several prior arrests and/or convictions involving narcotics.

27

28  13. Defendant MULLINS then checked the criminal justice information system which indicated

7

1    that plaintiff WILLIS was required to register as a sex offender.

2         Disputed. Objection as to relevancy.

3

4    14. Defendant MULLINS also checked the "parole book" or "parole roster" provided by the

5    California Department of Corrections to determine whether plaintiff WILLIS was on parole. The

6    roster that defendant MULLINS checked was the most current one he had.

7         Disputed. Defendant Mullins checked a parole list dated 03/11/1996.

8

9    15. Defendant MULLINS found plaintiff WILLIS' name in the most recent parole book/roster.

10

11   16. Defendant MULLINS understood that individuals whose names were found in the parole

12   book/roster were on parole. Because plaintiff WILLIS' name was in the parole book/roster,

13   defendant MULLINS believed that plaintiff WILLIS was on parole.

14        Disputed. According to Mullins' special report, Mullins checked only a parole list. The

15   parole rosters were provided to the CBPD once or twice a month. Since the parole list was only

16   issued once or twice a month, it was reasonably probable that the parole list was both inaccurate

17   or out-of-date, or both, and a reasonably prudent police officer would have determined whether

18   or not someone on the parole list was still on parole by checking with the parolee's agent of

19   record, Virginia Winings, who was listed on the parole roster as plaintiff's parole agent and who

20   was in the Bakersfield parole agents' office, Bakersfield Unit Six, or by having defendant Mora

21   call California ID Warrants. Instead, Mullins only showed the parole list to defendant Mora, a

22   California State parole agent, and asked defendant Mora to interpret whether the parole list was

23   accurate and whether plaintiff's parole was active.

24

25   17. Defendant MULLINS sought confirmation of plaintiff WILLIS' parole status, because the

26   parole book/roster listed the unfamiliar acronym "TIR" next to his name.

27

28   18. Defendant MULLINS conveyed the information about plaintiff WILLIS to defendant MORA

                                                    8

1   who the California Department of Corrections employed as a parole agent.

2

3   19. Defendant MULLINS asked defendant MORA to confirm whether plaintiff WILLS was on

4   "active" parole.

5

6   20. Defendant MORA reviewed the parole book/roster and confirmed that plaintiff WILLIS was

7   on "active" parole.

8

9   21. Defendant MORA believed the parole book/roster to be a reliable source of parolee

10  information. In defendant MORA's experience, the parole book/roster had never been incorrect

11  and it was frequently supplied to the BPD.

12

13  22. Relying on defendant MORA's representations and the known reliability of the parole

14  book/roster, defendant MULLINS concluded that plaintiff WILLIS was on active parole.

15

16  23. Defendant MORA facilitated the search of plaintiff WILLIS's motel room.

17          Disputed.  Defendant Mora directed defendant Mullins to conduct a parole search. In

18  1996, a parole agent was required to go out with the police in order to conduct a parole search.

19

20  24. At approximately 10 p.m., defendants MORA, MULLINS, SILVIUS and HOOD arrived at

21  plaintiff WILLIS's motel room to conduct a parole search.

22

23  25. On arriving at the motel, defendant MULLINS confirmed from motel records that plaintiff

24  WILLIS registered into room 221.

25

26  26. Defendants MORA, MULLINS, SILVIUS and HOOD then went to plaintiff WILLIS's motel

27  room. Defendants knocked on the door of the room.

28

27. When the door opened, defendant MULLINS saw a large sheath knife on plaintiff WILLIS's belt, a hypodermic syringe resting on a dresser and a woman inside the room.

Disputed.  Plaintiff opened the door only about two inches. It was impossible to see into the room because plaintiff's body was completely blocking any view into the room. The defendants immediately rushed into plaintiff's motel room, slammed him against the wall and handcuffed him.

28. The defendants entered the motel room announcing their intention to conduct a parole search.

Disputed.  When plaintiff opened the door to his motel room about two inches, defendant Mullins yelled "parole search," and then all of the defendants immediately rushed through the door and slammed the plaintiff against the wall and defendant Mullins handcuffed him.

29. Upon entering the motel room, the only apparent occupants of the room were plaintiff WILLIS and Kathleen Moye.

30. Plaintiff WILLIS announced to defendants MULLINS, SILVIUS, MORA and HOOD that he was not on parole and presented to defendant MULLINS a parole discharge card.

Disputed. After he had been handcuffed by defendant Mullins, plaintiff told the defendants that they had the wrong room and that he was not on parole. Defendant Mora responded by falsely representing that she [w]as plaintiff's agent of record, and that he had failed to report and that the defendants were conducting a parole search. Plaintiff advised the defendants of his former parole agent's name and that the parole agent was located in Fresno County. Plaintiff also informed the defendants that his parole discharge card was in his pocket, and defendant Mullins removed the card from plaintiff's hip pocket.

31. Defendant MULLINS did not consider the plaintiff WILLIS's parole discharge card as conclusive evidence that he was no longer on parole, as the parole discharge card could have been counterfeit and it conflicted with the parole book/roster.

Disputed. Defendant Mullins looked at plaintiff's parole discharge card, opined that "It looks authentic," and addressed defendant Mora, saying "I thought you said he was one of your people." To which defendant Mora replied: "I make mistakes." Defendant Mora then took plaintiff's parole discharge card from defendant Mullins and stated that: "I'll go call in and re-check," and thereupon left the room.

32. Defendant MULLINS and plaintiff WILLIS stepped out onto the balcony of the motel room after presenting his discharge card to the defendants.

33. Defendant MULLINS asked defendant MORA to validate plaintiff WILLIS' parole status.

34. Defendant MORA left the motel room to seek further verification regarding plaintiff WILLIS' parole status.

Disputed.  Defendant Mora left the motel room to check on plaintiff's parole status while plaintiff was still in the motel room.

35. While defendant MULLINS and plaintiff WILLIS were outside on the motel balcony, defendant SILVIUS, who had remained in the motel room with defendant HOOD observed that Kathleen Moye was under the influence of methamphetamine.

36. Ms. Moye admitted to the defendants SILVIUS and HOOD that she was under the influence of methamphetamine and that she had just recently smoked it.

Disputed.  Kathleen Moye was being detained by defendants Hood and Silvius at the time she made any admissions regarding her use of methamphetamine.

37. Ms. Moye then informed defendant SILVIUS that she had placed her "speed pipe" in the briefcase in plain view of the officers.

Disputed.  Kathleen Moye was being detained by defendants Hood and Silvius at the time

1   she made any admissions regarding the speed pipe. Kathleen Moye did not place the speed pipe

2   in the briefcase while the officers were in the motel room.

3

4   38. Defendant SILVIUS understood Ms. Moye's statement that she had placed a "speed pipe" in

5   the briefcase to mean that she either owned the briefcase or exercised authority over it.

6

7   39. Defendant SILVIUS asked Ms. Moye if he could retrieve the "speed pipe" from the briefcase

8   and she consented.

9        Disputed.  Defendant Silvius' statement that Moye gave consent is inadmissible hearsay.

10

11  40. When Ms. Moye made her admission regarding her use of methamphetamine, defendant

12  SILVIUS had not taken her into custody.

13       Disputed.  Kathleen Moye was being detained by defendants Hood and Silvius at the time

14  she made any admissions regarding her use of methamphetamine.

15

16  41. Before defendant SILVIUS could open the briefcase, defendant MULLINS and plaintiff

17  WILLIS reentered the motel room.

18

19  42. Defendant SILVIUS informed defendant MULLINS that he believed Ms. Moye was under

20  the influence of methamphetamine and that she identified the briefcase as where she placed her

21  "speed pipe."

22       Disputed.  Moye told Mullins that her speed pipe was in the briefcase.

23

24  43. Defendant MULLINS turned to plaintiff WILLIS and asked "You got anything to say about

25  that?" Plaintiff WILLIS responded, "If she did, I don't know nothing about it."

26

27  44. Defendant MULLINS then asked plaintiff WILLIS for the combination to the briefcase which

28  plaintiff WILLIS did not provide.

Disputed.  While plaintiff was still outside the motel room standing on the walkway with defendant Mullins, Mullins asked plaintiff if the defendants could search the motel room, to which the plaintiff responded: "No." When plaintiff was asked for the combination to the briefcase, he also refused to give it to the defendants. At no time did plaintiff Willis consent either to the search of his motel room or to the search of his briefcase.

45. Defendant SILVIUS then took plaintiff WILLIS's knife breaking the latch on the briefcase while stating, "We don't need his permission."

Disputed.  When plaintiff and Mullins went inside the motel room, Mullins advised Silvius and Hood that plaintiff would not give them permission to search the room, and that the defendants would have to wait until defendant Mora returned. Defendant Silvius responded that the defendants did not need plaintiff's permission for a search because Moye had admitted to being under the influence and that she had placed her things in plaintiff's briefcase. When plaintiff was asked for the combination to the briefcase, he also refused to give it to the defendants. At no time did plaintiff Willis consent either to the search of his motel room or to the search of his briefcase.

46. Defendant SILVIUS opened the briefcase on the understanding that Ms. Moye had consented to a search of the briefcase.

Disputed.  Any statement made by Moye consenting to the search of the briefcase is inadmissible hearsay.

47. During the search of the motel room, the defendants discovered evidence consistent with the sale and use of methamphetamine, such as: a. One hypodermic syringe containing a small amount of a brown fluid containing methamphetamine; b. One metal container approximately 1" round containing approximately 1.125 grams of suspected methamphetamine; c. A blue plastic container containing approximately five grams of methamphetamine; d. Approximately 25 hypodermic syringes contained in a briefcase; e. One set of electronic gram scales; f. Narcotics

1  packaging consisting of several small pieces of clear plastic and several zip lock baggies; and g.

2  Two glass methamphetamine smoking pipes and several spoons.

3       Disputed.  With the exception of the syringe laying on the motel room dresser, and item

4  b. the metal container, all of the drug paraphernalia, including syringes, plastic bags, a scale,

5  plastic containers, and spoons, belonged to Kathleen Moye, who had placed the items in plaintiff

6  Willis' briefcase prior to plaintiff returning to the room. The empty syringe laying on the dresser

7  in the motel room, which also belonged to Moye, was not in the briefcase. The small metal box

8  was seized from a visitor to the motel room who happened by while the search of the room was

9  in progress.

10

11  48. Defendant MULLINS arrested plaintiff WILLIS and Ms. Moye for violating Health and

12  Safety Code Sections 11378 (possession for sales of methamphetamine) and 11364 (possession

13  of narcotic paraphernalia).

14

15  49. The California Department of Corrections provided the parole book/roster to the Bakersfield

16  Police Department once or twice every month.

17

18  50. In defendant MULLINS' experience, the parole book/roster was a reliable source of

19  information for discovering whether an individual was on active parole.

20       Disputed.  Since the parole list was only issued once or twice a month, it was reasonably

21  probable that the parole list was both inaccurate or out-of-date, or both, and a reasonably prudent

22  police officer would have determined the whether or not someone on the parole list was still on

23  parole by checking with the parolee's agent of record, Virginia Winings, who was listed as

24  plaintiff's parole agent on the parole list, and who was in the Bakersfield parole agents' office,

25  Bakersfield Unit Six, or by having defendant Mora call California ID Warrants.

26

27  51. The City of Bakersfield does not maintain a formal or informal policy, custom or practice of

28  indemnifying police officers for punitive damages.

52. Neither Sgt. Joseph Mullins nor Det. Brian Silvius have ever had punitive damages assessed against them as a result of a civil judgment.

Disputed.  Relevancy.

53. The brown liquid in the syringe tested positive for methamphetamine, the powder found in the metal container tested positive for methamphetamine and cocaine and the powder found in the plastic container tested positive for methamphetamine.

Disputed.  The syringe defendant Mullins saw lying on the dresser was empty. All other drug paraphernalia that tested positive for methamphetamine was either in the plaintiff's briefcase or, in the case of the metal container, was seized from a visitor to the room while the search was in progress.

54. On March 27, 1996, plaintiff WILLIS was unemployed.

Disputed.  Plaintiff Willis was on temporary disability for a neck injury, receiving temporary disability payments.

55. Subsequent to his release from prison, plaintiff WILLIS sought and gained employment.

**B. Defendant Mora**

Plaintiff's Statement of Genuine Issues does not specifically address each of Defendant Mora's undisputed facts. See Doc. 150.  As the allegations contained therein do not affect the analysis and conclusion of this order, the court will consider the facts undisputed.

1. Plaintiff Gary Willis is a former California prisoner who was imprisoned in 1988 following his conviction in Kern County of lewd and lascivious acts with a child under 14 and threatening a witness.

Disputed. Relevancy.

2. Willis paroled to parole to Fresno County in April 1994. His parole agent was Doug Levers.

      Disputed. Relevancy.

3. Willis had parole conditions that barred him from going to Bakersfield in Kern [County] or leaving Fresno County for more than 48 hours without his parole agent's permission.  He was also required to register as a sex offender under California Penal Code section 290.

      Disputed. Relevancy.  That plaintiff Willis had parole conditions that barred him from going to Bakersfield in Kern [County] or leaving Fresno County for more than 48 hours without his parole agent's permission is not probative of any issue in this case because plaintiff had been discharged from parole and the requirement to register as a sex offender also goes to no issue in this case.

4. Willis was arrested on August 2, 1994, at his wife's house in North Edwards in Kern County after failing to report to his parole agent in Fresno County as instructed.  Willis had not registered as a sex offender.  Kern County Sheriffs deputies had received information that drug sales were taking place at the North Edwards address.  On the day of the arrest, deputies found a bindle of methamphetamine, $815 in cash, a tin of syringes and paper bundles, two scales, a grinder, a pay-and-owe sheet, sifters, packaging and related drug paraphernalia.  Willis was arrested and charged with possession of methamphetamine and drug paraphernalia and failure to register as a sex offender.

      Disputed. Relevancy.

5. Following a parole revocation hearing, Willis was found guilty of parole violations and returned to prison for leaving his county of residence for more than 48 hours without his parole agent's approval, failure to register as a sex offender, sale and trafficking of methamphetamine, and possession of drug paraphernalia.

      Disputed. Relevancy.

6. Willis discharged from prison on June 29, 1995.

7. Willis left California and traveled around the United States before returning to California in 1996.

8. When he returned, he was living in a motor home parked at his mother's house in Bakersfield.

9. Two days before March 27, 1996, Willis's motor home was stolen.

10. On the morning of March 27, 1996, Willis registered at an Easy 8 Motel in Bakersfield, California.

11. Willis had a briefcase and clothing bag with him when he went to the motel.

12. Kathleen Moye entered the motel room with Willis around 8:00 a.m.

13. Willis left the room shortly after Moye arrived.

14. Moye stayed behind in the room until Willis returned later that evening.

15. When Willis left the room, he left behind his briefcase with a combination lock that he generally kept locked.  The briefcase had $2,000 to $3,000 worth of jewelry containing precious and semi-precious stones inside.

16. While Willis was gone, Moye used the telephone and a person delivered a set of scales, a small container with "speed" in it, another container with cocaine, pipes, a couple of syringes, and some "weed."

17. On the afternoon of March 27, 1996, Bakersfield Police Officer Mullins, who was working with the Kern Narcotics Enforcement Team multi-jurisdictional task force that targeted narcotics and narcotics users, received telephone call from an employee of the E-Z 8 Motel at 2604 Pierce Road in Bakersfield, Kern County, who told him that there was a large amount of telephone and foot traffic in and out of Room 221, which was registered to Willis.

Disputed.  The motel employee advised defendant Mullins only that "he/she had noticed a large amount of phone traffic at Room 221," and did not mention that there was any foot traffic at all.

18. Officer Mullins knew the motel to be an inexpensive one located near a freeway in an area of Bakersfield known as Oildale that was known to have a significant level of methamphetamine activity.

19. Officer Mullins checked Willis's name and driver's license number provided by the motel employee, and Willis's date of birth using the local criminal justice information system and found that he had several prior arrests and convictions.

20. Officer Mullins also noted that Willis was required to register as a sex offender under California Penal Code § 290 and that the E-Z 8 Motel was not his registered address.  Officer Mullins had an indication that Willis might be in violation of the registration requirement, but did not have probable cause at that time to arrest him for failing to register, although he would have confirmed Willis's current address during a parole search.

Disputed.  Relevancy.

21. Officer Mullins also checked a roster of parolees in his office that was dated either March 6 or 16, 1996.  The roster was the most current one he had.

Disputed.  Defendant Mullins checked a parole list dated 03/11/1996.

22. The parole roster listed the names of parolees under supervision in Kern County by the Bakersfield Office of the Paroles & Community Services Division (PCSD) of the California Department of Corrections and Rehabilitation (CDC\R), formerly the California Department of Corrections.  A copy of the roster was provided to the Bakersfield Police Department once or twice a month so the police would not have to contact the parole office every time they wanted to determine whether a person was on parole.  The roster listed the parolee's name, CDCR number, the assigned parole agent, and the parolee's status which could be "active,:" "TIR," "suspended," or "discharged ."  A "TIR" entry meant that the parolee was active and that a request had been made to either transfer his parole from Kern County to another county or to transfer parole from another county to Kern [County].

       Disputed.  According to defendant Mora, the parole list also contained plaintiff Willis' agent of record, Virginia Winings, who was in the Bakersfield parole agents' office, Bakersfield Unit Six.

23. Parole Agent Mora was in Officer Mullins's office at the time, so he asked her to look at the entry for Willis and tell him whether "TIR" meant that Willis was on active parole.  Agent Mora said that "TIR" indicated that Willis was an "active" parolee and that a transfer request had been made but she did not know whether Fresno or Kern County had made the transfer investigation request in Willis's case.  Based on the roster entry, Agent Mora believed that Willis was on parole because if the roster entry did not indicate that he had discharged, he was on active parole. In Mora's experience, the parole roster contained reliable information regarding a parolee's status and had not been incorrect in her past experience; therefore, she did not feel it was necessary to further check on Willis's status with Agent Winings, who was the agent of record noted on the roster.  Mora had no direct knowledge of Willis's status, but relied on the information on the parole roster she was shown.

24. The parole lists were provided to the CBPD once or twice a month. Since the parole lists were only issued once or twice a month, it was reasonably probable that the parole list was both

1   inaccurate or out-of-date, or both, and a reasonably prudent parole officer would have determined

2   whether or not someone on the parole list was still on parole by checking with the parolee's agent

3   of record, Virginia Winings, who was listed on the parole list and who was in the Bakersfield

4   parole agents' office, Bakersfield Unit Six, or by calling California ID Warrants. Instead,

5   defendant Mora looked only at the parole list and then directed defendant Mullins to conduct a

6   parole search of plaintiff Willis' motel room.

7

8   25. The roster was prepared by clerical staff in the Bakersfield Parole, and Agent Mora did not

9   know how often staff updated it or what the mechanism was for updating the status of inmates on

10  the list.  Clerical staff were responsible for correcting an[y] known errors regarding a parolee's

11  status.

12       Disputed. The parole lists were provided to the CBPD once or twice a month. Since the

13  parole list[s] were only issued once or twice a month, it was reasonably probable that the parole

14  list was both inaccurate or out-of-date, or both, and a reasonably prudent parole officer would

15  have determined whether or not someone on the parole list was still on parole by checking with

16  the parolee's agent of record, Virginia Winings, who was listed on the parole list and who was in

17  the Bakersfield parole agents' office, Bakersfield Unit Six, or by calling California ID Warrants.

18  Instead, defendant Mora looked only at the parole list and then directed defendant Mullins to

19  conduct a parole search of plaintiff Willis' motel room.

20

21  26. Agent Mora, Officers Mullins and Silvius, and Kern County Sheriff's Deputy Hood went to

22  the motel to conduct a parole search and arrived there around 10:00 p.m.

23

24  27. Willis returned to the motel room no more than 15 minutes before the officers arrived.

25

26  28. When the officers arrived, Officer Mullins checked motel records and confirmed that Willis

27  was registered in Room 221.

28

29. Mora and the officers then went Willis's room, where Deputy Hood knocked on the door.

30. Willis asked who was there, and Hood replied, "It's Bill."

31. Willis responded that he didn't know a "Bill."

32. Hood answered, "Bill from the police. Open the door, please."  Willis replied, "It had better be" and opened the door about two inches.

33. When the door opened, Willis was standing with one hand on the door knob and the other on the hilt of a large knife in a sheath on his belt.

     Disputed.  Plaintiff opened the door only about two inches. It was impossible to see into the room or that plaintiff Willis had one hand on the door knob, because plaintiff's body was completely blocking any view into the room. The defendants immediately rushed into plaintiff's motel room, slammed him against the wall and handcuffed him.

34. Officer Mullins saw the knife, was concerned that it could be used as a weapon, and thought it was a parole violation.

35. Mullins also saw Moye and a hypodermic syringe on a dresser in the room.

     Disputed.  Plaintiff opened the door only about two inches. It was impossible to see into the room or that plaintiff Willis had one hand on the door knob, because plaintiff's body was completely blocking any view into the room. The defendants immediately rushed into plaintiff's motel room, slammed him against the wall and handcuffed him.

36. Officer Mullins announced that they were there for a parole search; and Agent Mora and the officers entered the room.

37. Officer Mullins handcuffed Willis.

38. Willis said they could not do a parole search because he was not on parole.

       Disputed.  After he had been handcuffed by defendant Mullins, plaintiff told the defendants that they had the wrong room and that he was not on parole. Defendant Mora responded by falsely representing that she was plaintiff's agent of record, and that he had failed to report and that the defendants were conducting a parole search. Plaintiff advised the defendants of his former parole agent's name and that the parole agent was located in Fresno County. Plaintiff also informed the defendants that his parole discharge card was in his pocket, and defendant Mullins removed the card from plaintiff's hip pocket.

39. Agent Mora or the officers identified her as his parole officer.

40. Willis said she could not be his parole agent unless she had a sex change because his parole agent was Doug Levers from Fresno County and that he had discharged in June 1995.

       Disputed.  After he had been handcuffed by defendant Mullins, plaintiff told the defendants that they had the wrong room and that he was not on parole. Defendant Mora responded by falsely representing that she [w]as plaintiff's agent of record, and that he had failed to report and that the defendants were conducting a parole search. Plaintiff advised the defendants of his former parole agent's name and that the parole agent was located in Fresno County. Plaintiff also informed the defendants that his parole discharge card was in his pocket, and defendant Mullins removed the card from plaintiff's hip pocket.

41. Willis said he had a card in his pocket showing that he had discharged on June 29, 1995.

42. Officer Mullins took the card from Willis's wallet and said he thought it looked authentic.

43. Officer Mullins told Agent Mora that "I thought you said he was one of your people." parolee

[sic].

44. Agent Mora said, "I make mistakes."

45. Officer Mullins then asked Willis to step outside the room.

     Disputed.  Defendant Mullins looked at plaintiff's parole discharge card, opined that "It looks authentic," and addressed defendant Mora, saying "I thought you said he was one of your people."  To which defendant Mora replied: "I make mistakes."  Defendant Mora then took plaintiff's parole discharge card from defendant Mullins and stated that: "I'll go call in and re-check," and thereupon left the room.

46. Willis then went outside the room with Officer Mullins who closed the door.

47. Officer Silvius and Deputy Hood remained in the room with Moye.

48. Agent Mora went out on the walkway outside the room initially, but left and went downstairs to either her car or the motel office and tried to contact someone to verify whether Willis had been discharged from parole.

49. Agent Mora tried to reach Parole Agent Winings, but was unsuccessful.  She also tried Sacramento ID Warrants.

50. Agent Mora was away from Room 221 for 15 minutes.

     Disputed. Agent Mora was away from Room 221 for 15 to 30 minutes.

51. When Agent Mora returned, she told Officer Mullins that Willis was not on parole and had been discharged.

52. Mora left a short time later and did not search the motel room or anything in it, did not detain Willis for parole violations, and did not authorize or participate in his arrest.

53. Willis did not see Agent Mora again after she left to re-check his parole status, she never returned to the room.

    Disputed.  Agent Mora was away from Room 221 for 15 to 30 minutes and when she returned she advised defendant Mullins that plaintiff Willis had been discharged from parole.

54. Officer Mullins went back in the room with Willis, and Officer Silvius directed his attention to Willis's briefcase.

55. The briefcase contained a hypodermic syringe containing a small amount of brown fluid that Officer Mullins believed contained methamphetamine, a blue plastic container which contained about five grams of methamphetamine, two hypodermic syringes, a set of electronic gram scales, narcotic packaging consisting of several small pieces of clear plastic and several Ziplock baggies, two glass methamphetamine smoking pipes, several spoons, and a handwritten pay-and-owe sheet.

56. The briefcase also contained keys, nail clippers, forceps, beads, and a bracelet that were not seized.

57. Mullins found $879 dollars, including thirty four $20-dollar bills in Mullins pants pocket.

    Disputed.  The $879.00 retrieved during Mullins' search of Willis and found in plaintiff Willis' pocket consisted of $500 which plaintiff Willis had withdrawn from the bank and his $379.00 disability check that he had cashed that day.

58. Mullins arrested Willis and Moye.

59. Willis who was charged and convicted of possession of a controlled substance for purpose of sale (Health & Saf. Code § 11378) and misdemeanor possession of drug paraphernalia (Health & Saf. Code § 11364), but the conviction was overturned in People v. Willis, 28 Cal.4th 22 (2002).

60. Willis was released from prison in August 2002.

## IV. Discussion

### A. Section 1983 Claim

In counts one and two of the operative complaint, Plaintiff claims the Defendants violated his Fourth and Fourteenth Amendment rights.  These allegations form the core of Plaintiff's case. Defendants argue that summary adjudication should be granted in this case because they did not violate Plaintiff's constitutional rights, or in the alternative, they are entitled to qualified immunity.  In relation to Plaintiff's claim, Bakersfield Defendants address two actions: the initial entry into the motel room and the search of the briefcase which yielded methamphetamine and drug paraphernalia.[2]  The two parts give rise to liability disjunctively; Bakersfield Defendants would face liability if Plaintiff were to ultimately succeed in demonstrating that either of those actions constituted a constitutional violation for which qualified immunity should not apply. Defendant Mora discusses the legal consequences of the initial entry into the motel room and her later contact with Sacramento to ascertain Plaintiff's parole status.  Though the matter is before the court on Defendants' motions for summary judgment and not cross motions, summary adjudication will be granted on all issues for which it is appropriate and helpful to further the progress of litigation.

---

[2]The briefing does not discuss whether other Defendant actions (i.e. staying in the motel room while detaining Plaintiff outside; detaining and questioning Ms. Moye inside the motel room) could constitute independent bases for Plaintiff's claims.  The court expresses no opinion regarding those actions.

25

**1. Initial Entry**

The Defendants initially entered into the motel room based on the erroneous belief that Plaintiff was subject to a parole condition. Plaintiff asserts that the initial decision to conduct a parole search based on the Parole Roster was "objectively unreasonable." Doc. 148, Plaintiff's Opposition, at 15:17. Defendant Mora argues that there was no Fourth Amendment violation in the initial entry as "Neither Mora nor the other officers knew that Willis was no longer on parole at the time they decided to initiate the parole search." Doc. 142, Defendant Mora's Brief, at 7:5-6. Bakersfield Defendants concur and further argues that qualified immunity applies even if the initial entry into the motel room did violate Plaintiff's right to be free from unreasonable search. Doc. 141, Part 2, Bakersfield Defendants' Brief, at 10:3-13:28.

The pertinent facts are largely uncontested. Plaintiff's name was on the Parole Roster in error. The Parole Roster is distributed by the California Department of Corrections to the police departments once or twice a month. Defendants received a call from the operator of a motel concerning excessive phone traffic from a room registered to Plaintiff.[3] Based solely on their belief that Plaintiff was a parolee subject to a search condition, Defendants entered the motel room without Plaintiff's consent. Plaintiff provided proof that he was discharged from parole after Defendants were inside. In the criminal prosecution of Plaintiff, the California Supreme Court found, and the California Attorney General's office conceded, that "A Fourth Amendment violation occurred when the officers entered the motel room." People v. Willis, 28 Cal. 4th 22, 29 (Cal. 2002). Defendants entered to search the premises without a warrant. There was insufficient evidence to justify the entry based on exigent circumstances. As Plaintiff was not subject to a search condition, the entry violated the Fourth Amendment. People v. Downing, 33 Cal. App. 4th 1641, 1650-1 (Cal. Ct. App. 1995) ("Where, however, the search is later found to be invalid, as in this case where it was conducted pursuant to a probation condition or 'consent'

---

[3]The parties dispute whether the motel operator reported excessive phone traffic or excessive phone and foot traffic. The court takes all inferences in favor of the non-moving party. The dispute is immaterial since even if excessive phone and foot traffic was reported by the motel operator, Defendants would not have had sufficient cause to exercise a warrantless search.

that had expired, i.e., was nonexistent, at the time of the search, a Fourth Amendment violation is shown").

This conclusion comports with case law concerning erroneous arrests of individuals based on errors in the warrant.  The District of Nevada faced a situation where a criminal defendant was arrested based on a warrant for parole violations promulgated through a federal database.  The database contained faulty information as the warrant had been recalled five months prior.  While searching the individual incident to the arrest, contraband was found, which lead to a separate charge and conviction.  The court found a constitutional violation and suppressed all evidence gathered incident to the arrest, stating "a computer inaccuracy of this nature and duration, even if unintended, amounted to a capricious disregard for the rights of the defendant as a citizen of the United States. The evidence compels a finding that the government's action was equivalent to an arbitrary arrest, and that an arrest on this basis deprived defendant of his liberty without due process of law." United States v. Mackey, 387 F. Supp. 1121, 1125 (D. Nev. 1975).  The Mackey decision has been approvingly cited by the Central District of California which ruled that the plaintiff in a Section 1983 suit had his Fourth Amendment rights violated when he was repeatedly arrested based on mistaken information contained in a federal database. Rogan v. Los Angeles, 668 F. Supp. 1384, 1392 (C.D. Cal. 1987).  Overall, courts within the jurisdiction of the Ninth Circuit appear to conclude that "Inaccurate information cannot serve as a basis for probable cause." Kirk v. Hesselroth, 707 F. Supp. 1149, 1152 (N.D. Cal. 1988).[4]

---

[4]Courts within other circuits may very well have a different analysis.  "In cases where a clerical error (e.g., failure to update records, transposing numbers in running a license plate check, failure to report that a warrant has been served or quashed, etc.) leads to a search or seizure, and the defendant moves to suppress the evidentiary fruits of that search or seizure, courts have taken a variety of approaches in determining whether the evidence should be admitted. Some courts assume that a search or seizure based on a clerical error is unlawful, and only address whether the good faith exception to the exclusionary rule otherwise permits the evidentiary fruits of the unlawful seizure to be admitted into evidence. See United States v. Santa, 180 F.3d 20 (2nd Cir. 1999) (considering only whether the good faith exception excluded evidence seized after arrest pursuant to vacated warrant). Other courts address the questions

1    That leads to the question of qualified immunity.  "The purpose of the qualified immunity

2    rule is to protect from suit government officials who make reasonable mistakes in the course of

3    duty." Moore v. Lamarque, 2007 U.S. App. LEXIS 16163, *2 (9th Cir. 2007).  Qualified

4    immunity covers "mistakes in judgment, whether the mistake is one of fact or one of law."

5    Kennedy v. Ridgefield City, 439 F.3d 1055, 1079 (9th Cir. 2006), quoting Butz v. Economou,

6    438 U.S. 478, 507 (1978); see also Dias v. Elique, 436 F.3d 1125, 1131 (9th Cir. 2006), citing

7    Saucier v. Katz, 533 U.S. 194, 201 (2001).  "The contours of the right must be sufficiently clear

8    that a reasonable official would understand that what he is doing violates that right. This is not to

9    say that an official action is protected by qualified immunity unless the very action in question

10   has previously been held unlawful, but it is to say that in the light of pre-existing law the

11   unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "[I]t is

12   inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude

13   that probable cause is present, and we have indicated that in such cases those officials -- like

14   other officials who act in ways they reasonably believe to be lawful -- should not be held

15   personally liable....The relevant question in this case, for example, is the objective (albeit

16   fact-specific) question whether a reasonable officer could have believed [the police defendant's]

17   _____

18   separately, examining first whether the police error rendered the search unreasonable and, if so,

19   examining whether the good faith exception should apply to permit the use of that evidence. See
     United States v. Herrera, 444 F.3d 1238 (10th Cir. 2006). Other decisions also treat the questions

20   separately, but, as the government would have the Court do here, look at the officer's
     reasonableness in relying on his own mistake both for purposes of determining whether there was

21   a Fourth Amendment violation and for purposes of determining whether the good faith exception

22   applies. See United States v. De Leon-Reyna, 930 F.2d 396 (5th Cir. 1991) (en banc) (per
     curiam) (finding that good faith reliance on police mistake could be considered in

23   constitutionality of stop and permitted reliance on good faith exception)." United States v.
     Anderson, 2007 U.S. Dist. LEXIS 45137, *13-15 (N.D. Ohio 2007).  "In analyzing cases within

24   the scope of this annotation, most courts look to the Fourth Amendment to see if the officers'

25   good-faith reliance on inaccurate police records provided probable cause for valid arrests; a few
     courts use a due process analysis. Although one court distinguished between a search of a

26   defendant's dwelling and a search of his car or personal property, the primary factor courts

27   consider is the amount of time elapsed between the invalidation of the warrant or stolen car
     warning, and the arrest." Joan Teshima, Annotation, *Validity of Arrest Made in Reliance Upon*

28   *Uncorrected or Outdated Warrant List or Similar Police Records*, 45 A.L.R. 4th 550 (1986).

warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987).  Defendant Mora, as a parole officer, is also subject to the same qualified immunity analysis as the police officers in this case. See <u>Swift v. California</u>, 384 F.3d 1184, 1190 n.4 (9th Cir. 2004) ("The majority of circuits addressing the scope of official immunity for parole officials have held that when a parole officer is performing a law enforcement function, the officer is entitled to only qualified immunity").

The law is clear concerning the requirements for a search.  Based on information provided by the California Department of Corrections, Defendants in this case believed that Plaintiff was on parole and subject to search under something akin to the reasonable suspicion standard instead of the probable cause standard.  Their belief that Plaintiff was on active parole was wrong.  In one case, the California Supreme Court has stated that "the police may not rely upon incorrect or incomplete information when they are at fault in permitting the records to remain uncorrected....Suppressing the fruits of an arrest made on a recalled warrant will deter further misuse of the computerized criminal information systems and foster more diligent maintenance of accurate and current records." <u>People v. Ramirez</u>, 34 Cal. 3d 541, 545-7 (Cal. 1983).

Though the law was clear and the language of the California Supreme Court sets out a clear policy in favor of encouraging police to keep accurate records, exclusionary rule analysis differs from qualified immunity analysis.  "The exclusionary rule was created to ensure that police would be deterred from acting in an unconstitutional manner by virtue of the knowledge that any evidence seized would be tainted and inadmissible. In such a context, it is logical to hold police officers accountable for the collective knowledge of the entire law enforcement team. However, in a § 1983 action individual civil liability is at issue. In such a situation, the officer can be held accountable -- and therefore subject to personal liability -- only for his or her own knowledge." <u>Ingram v. City of Los Angeles</u>, 418 F. Supp. 2d 1182, 1190 (C.D. Cal. 2006).  The Central District cites to U.S. Supreme Court dicta which states, "If the flyer ['wanted flyer' from another jurisdiction] has been issued in the absence of a reasonable suspicion, then a stop in the

objective reliance upon it violates the Fourth Amendment. In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit." United States v. Hensley, 469 U.S. 221, 232 (1985).[5]

Qualified immunity thus boils down to whether it was reasonable for Defendants to rely on the information contained in the Parole Roster in order to determine if an individual is subject to a parole search condition. The court could not find any direct precedent on the issue. The Third Circuit has said, "we have generally extended immunity to an officer who makes an arrest based on an objectively reasonable belief that there is a valid warrant. Nevertheless, an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances. Such circumstances include, but are not limited to, other information that the officer possesses or to which he has reasonable access." Berg v. County of Allegheny, 219 F.3d 261, 273 (3rd Cir. 2000). Before the initial entry, Defendants possessed no information that suggested Plaintiff's parole had ended. Plaintiff

---

[5]The logic of the Ingram opinion is facially in tension with another U.S. Supreme Court case, which says "the same standard of objective reasonableness that we applied in the context of a suppression hearing in Leon defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest." Malley v. Briggs, 475 U.S. 335, 344 (1986). Some courts have suggested that the Malley rule of identical qualified immunity and exclusionary rule analysis also applies to officers executing warrants. See, e.g., Bailey v. Kenney, 791 F. Supp. 1511, 1519 (D. Kan. 1992) ("qualified immunity is available to officers who execute a warrant that is not supported by probable cause if the police conduct could nonetheless be deemed constitutional under the suppression hearing standards"); Vitalone v. Curran, 665 F. Supp. 964, 974 n.8 (D. Me. 1987) ("a police officer who executes an arrest warrant will be liable under the same circumstances in which suppression of evidence would be appropriate"). Other cases have said that the Malley rule of equivalence does not extend to the execution of warrants. See, e.g., Pickens v. Hollowell, 59 F.3d 1203, 1207 (11th Cir. 1995) (in distinguishing Malley, "these two deputies did not cause the warrants to be issued, all they did was execute them"); Heine v. Connelly, 644 F. Supp. 1508, 1514 n.6 (D. Del. 1986) (the rule "would not apply here because, unlike Malley, these officers did not provide the affidavits from which the magistrate inferred probable cause. Rather, they executed the magistrate's determination of probable cause based on his own perception of Heine's absence). The court finds that the rule articulated in Malley is limited to police officers who request a warrant and not to police officers who execute the warrant (unless they are one and the same). Ingram's rationale for distinct exclusionary rule and qualified immunity standards in general is accepted.

1  argues that Defendants made insufficient inquiry as Defendant Mora "did not check to see if

2  plaintiff still was on parole with Plaintiff's parole agent of record, Virginia Winings, who,

3  according to Mora, was an agent in the Bakersfield office and whose name was listed on the

4  parole list. Another option Mora chose not to exercise was to check with the California ID

5  warrants in Sacramento, to ascertain whether or not plaintiff was on active parole." Doc. 148,

6  Plaintiff's Opposition, at 15:6-13.  Both of those sources possessed the correct information that

7  Plaintiff had been discharged from parole several months prior. See Doc. 143, Ex. H, Mora

8  Declaration, at 3:4-8.

9      The Defendants cite to Sanchez v. Bratton, 2006 U.S. Dist. LEXIS 21676 (C.D. Cal.

10  2006) for the proposition that Plaintiff's suggested options are not legally required. Doc. 154,

11  Defendant Mora's Reply, at 6:25-7:10; Doc. 156, Bakersfield Defendants' Reply, at 3:16-17.  In

12  Sanchez, police consulted a list of active probationers and searched an address at which they

13  thought a probationer was residing.  In fact, the probationer was in state prison for a parole

14  violation.  The court stated that "in order to protect the right of third party residents, 'before

15  conducting a warrantless search pursuant to a parolee's parole condition, law enforcement

16  officers must have probable cause to believe that the parolee is a resident of the house to be

17  searched'" Sanchez v. Bratton, 2006 U.S. Dist. LEXIS 21676, *21 (C.D. Cal. 2006), quoting

18  Motley v. Parks, 432 F.3d 1072, 1080 (9th Cir. 2005).  Qualified immunity was granted on the

19  following basis: "Plaintiffs point to several actions that Defendants arguably *could* have taken to

20  discover that Oscar [the probationer] was in jail, including calling the California Department of

21  Corrections Inmate Locator phone number, checking Oscar's FBI records, or reading Oscar's

22  prior arrest report and probation sentencing order. But Plaintiffs have provided no authority that

23  would require Defendants to take such steps, and presumably more if necessary to determine

24  whether a probationer was, in fact, not in custody anywhere else, and the Court declines to

25  establish such a requirement." Sanchez v. Bratton, 2006 U.S. Dist. LEXIS 21676, *23 (C.D. Cal.

26  2006).  The situation in Sanchez does not correspond perfectly to the situation at hand; namely,

27  the type of error is different.  The police in that case pointedly confirmed the probation status of

28  the individual in question and there was no dispute that the address searched was the place where

1   the individual resided whenever he was not in prison. Sanchez v. Bratton, 2006 U.S. Dist. LEXIS

2   21676, *10-1 (C.D. Cal. 2006) ("prior to the search, [the police officer] reviewed the minute

3   order in which Oscar was sentenced to probation, including search condition"). To some degree,

4   the error can be characterized as random as opposed to systemic.

5       The class of errors that potentially plague the Parole List in this case is more akin to the

6   situation in Smith v. Oklahoma City, 696 F.2d 784 (10th Cir. 1983). In that case, the police had

7   a policy of issuing an arrest warrant for the owner of a vehicle when the vehicle acquires three or

8   more unpaid parking tickets. In issuing the warrants, the police consulted a database that

9   indicates the current owner of the car without specifying when the owner first took possession of

10  that vehicle. Thus, some owners might have arrest warrants issued against them based on unpaid

11  parking tickets of the previous owner. The Tenth Circuit found that a warrant issued through this

12  process violated the plaintiff's constitutional rights and remanded the case for a jury trial on

13  damages. Specifically, the Tenth Circuit stated, "The Tax Commission computers can surely be

14  programmed to show when vehicle title transfers occurred, and thus can be programmed to show

15  who owned the vehicle at the time the alleges violations occurred." Smith v. Oklahoma City, 696

16  F.2d 784, 787 (10th Cir. 1983). Relying on an information system which knowingly and

17  structurally provides for a class of erroneous warrants will result in civil liability. It is one thing

18  to have random errors, which may occur in even the best of systems, but where the information

19  system, by its very design generates false positives of a specific category that can easily be

20  avoided, it may not be reasonably relied upon.

21      Another relevant case is Kirk v. Hesselroth, 707 F. Supp. 1149 (N.D. Cal. 1989). In Kirk,

22  a defendant police officer consulted a criminal identification specialist at a California agency to

23  determine if the plaintiff was required to register as a sex offender and was incorrectly told that

24  plaintiff must register. When confronted by defendant officer, the plaintiff said that under the

25  terms of his criminal judgment, registration was not required. The defendant officer warned him

26  that regardless, registration was required and entered his name into a police database of

27  individuals who failed to register. Plaintiff was later arrested by other police officers when they

28  ran his information through the database during a traffic stop. The court found a constitutional

violation but sent the question of qualified immunity to a jury because there was factual dispute over whether defendant officer received any advice to verify the registration requirement information from an independent source. <u>Kirk v. Hesselroth</u>, 707 F. Supp. 1149, 1155 (N.D. Cal. 1989).  Overall, when officers "did not have any reason to question the integrity of the information provided by the" database, their reliance on information from that database is reasonable. <u>United States v. Miguel</u>, 368 F.3d 1150, 1154 (9th Cir. 2004) (context of reasonable suspicion for traffic stop).  When they either received warnings about reliability or should have known that the database was flawed from its very design, officers may not rely on information from that database.

In this case, the parties have not clarified how the Parole Roster was compiled.  The parties have not provided details about how the Parole Roster dealt with parolees soon to be discharged.  The  Parole Roster did not contain any information about when each parolee was to be discharged. Doc. 143, Ex. H, Mora Declaration, at 1:28-2:7.  However, there is no indication whether individuals who were to be discharged from parole that month were included on the Parole Roster or whether they were excluded from the list.  Further, there is no record of what the Defendants knew or were told about the Parole Roster with regard to that class of individuals. Defendant Mora claims that "Because Mora and the officers did not know or have reason to know that Willis's inclusion in the parole roster was incorrect, they had no reason to make further inquiries." Doc. 142, Mora Brief, at 7:11-12.  Some courts have considered the overall accuracy of the database consulted in criminal suppression motions. See <u>People v. Jones</u>, 110 Misc. 2d 875, 884 (N.Y. Crim. Ct. 1981) ("20%, an inaccuracy rate that is unquestionably substantial"); <u>Patterson v. United States</u>, 301 A.2d 67, 69 (D.C. 1973) ("In the officer's experience he had never before known the teletype to be wrong").  In this case, we have Defendant Mora's declaration that "in my experience prior to March 27, 1996, I had not found that the parole roster contained errors regarding a parolee's status." Doc. 143, Ex. H, Mora Declaration, at 2:13-15.  Defendant Mullins concurred: "Q. Had there ever been a time when you looked at someone's status of whether or not they were on parole and the parole book was mistaken prior to this? A. No, sir." Doc. 143, Ex. E, Mullins Deposition, at 59:12-15.  While this

1   information is relevant, it is not sufficient in and of itself to demonstrate that Defendants were

2   not on notice as to possible error in the Parole Roster.  Defendant Mora states "It is undisputed

3   that the list was the most recent one issued and that plaintiff's name was on it. There is no factual

4   predicate for the inference that Mora should have known the list contained an error, simply

5   because it was two weeks old." Doc. 155, Defendant Mora's Response to Disputed Material

6   Facts, at 4:3-5.  All reasonable inferences must be made in favor of the non-moving party, in this

7   case, Plaintiff.  Given the lack of information, there is insufficient evidence to support

8   Defendants' claim of qualified immunity at this time.  What Defendants knew or should have

9   known about the Parole Roster with regards to individuals who may have been discharged since

10  the time the operative Parole Roster was compiled is key.  Whether Defendants' reliance on that

11  list was reasonable under the circumstances can not be determined as a matter of law from the

12  facts provided.

13        Defendants have the right to interlocutory appeal of the qualified immunity ruling

14  concerning issues of law pursuant to Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).  Plaintiff has

15  requested certification pursuant to Chuman v. Wright, 960 F.2d 104, 105 (9th Cir. 1992), which

16  would cut off Defendants' right to interlocutory appeal unless the Ninth Circuit grants

17  Defendants a discretionary stay.  Such certification is merited when any appeal would be

18  frivolous or when the defense has been waived.  In this case there has been no waiver and appeal

19  of the legal issues would not be frivolous as they are not at all clear in light of Sanchez.

20

21  **2. Further Search**

22        After Plaintiff provided Defendants with a parole discharge card, the legal situation

23  shifted.  Plaintiff claims "the evidence demonstrates that defendants, at least after they were

24  informed the plaintiff was not on parole, and thereafter acted in complete, conscious indifference

25  towards plaintiff's constitutional rights." Doc. 148, Plaintiff's Opposition, at 21:8-11.  Defendant

26  Mora left the scene to determine Plaintiff's true parole status.  Defendant Mullins detained

27  Plaintiff outside the room and Defendants Silvius and Hood detained Ms. Moye inside the room.

28  Defendants then searched the briefcase and arrested both Plaintiff and Ms. Moye.

1    Defendant Mora claims that her role in the events after Plaintiff provided his parole

2    discharge card were limited solely to confirming his status: "The question of whether the other

3    Defendants acted lawfully in arresting Willis for narcotics violations is a separate issue. Mora's

4    conduct was based on a reasonable belief that Willis was on parole, and she terminated her parole

5    search when she verified that he was not." Doc. 142, Defendant Mora's Brief, at 7:22-24.

6    Defendants' refusal to take Plaintiff's parole discharge papers at face value may be considered

7    reasonable. Lauer v. Dahlberg, 717 F. Supp. 612, 614 (N.D. Ill. 1989).  There does not appear to

8    be any factual dispute over Defendant Moye's actions.  Defendant Moye's further investigation

9    to confirm Plaintiff's parole status did not violate Plaintiff's constitutional rights.

10    Defendant Mullins states that "After entering the motel room, Gary Willis declared that

11    he was not on parole and presented a discharge card. I did not consider the parole discharge card

12    as conclusive evidence that Gary Willis was no longer on parole, as the parole discharge card

13    could have been counterfeit since it conflicted with the parole book/roster. During the search of

14    the motel room, we discovered..." Doc. 141, Part 5, Mullins Declaration, at 2:26-3.  In the police

15    report he filed on March 27, 1996 concerning the arrest of Plaintiff and Ms. Moye, he stated, ""I

16    spoke with him outside the motel room. I told him that based on what I had already seen and

17    heard I believed I had sufficient information to obtain a search warrant whether or not he was on

18    parole....Willis agreed that I had his permission to retrieve the methamphetamine rather than wait

19    the extended period of time it would take to get a search warrant if he was proven not to be on

20    parole." Doc. 151, Ex. 2, Police Report, at pages 3-4.  Plaintiff specifically denies that he ever

21    gave consent to Defendants continued presence in the room, search of the room, and search of the

22    briefcase. Doc. 143, Ex. C, Transcript of Appeal to Fifth District Court of Appeal, at 47:18-

23    48:26.  As there is a factual dispute, summary judgment is not appropriate on this point.

24    The Bakersfield Defendants also argue that the search of the briefcase can be justified

25    based on Ms. Moye's consent.  Defendant Silvius states that "I asked her if I could retrieve the

26    'speed pipe' from [the briefcase]. Kathleen Moye agreed to my request." Doc. 141, Part 4,

27    Silvius Declaration, at 2:24.  Plaintiff does not challenge the fact that Ms. Moye told Defendant

28    Silvius that she placed a speed pipe into the briefcase.  Neither side has been able to track down

Ms. Moye so that hearsay statement appears to be admissible as a statement against interest

pursuant to Fed. R. Evid. 804(b)(3).  The uncontested facts are sufficient to show that Ms. Moye

exercised some form of authority over the briefcase in common with Plaintiff.  "'[W]hen the

prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to

proof that consent was given by the defendant, but may show that permission to search was

obtained from a third party who possessed common authority over or other sufficient relationship

to the premises or effects sought to be inspected.' Common authority rests on mutual use of the

property by those generally having joint access or control so that it is reasonable to recognize that

any of the parties has the right to permit inspection and others have assumed the risk that the

third parties might consent to the search." United States v. Yarbrough, 852 F.2d 1522, 1533-4

(9th Cir. 1988), quoting United States v. Matlock, 415 U.S. 164, 171 (1974).  Plaintiff objects

that Defendant Silvius's statement regarding Ms. Moye's consent is inadmissible hearsay and

should not be relied upon.  "If the significance of an offered statement lies solely in the fact that

it was made, no issue is raised as to the truth of anything asserted, and the statement is not

hearsay....The effect is to exclude from hearsay the entire category of 'verbal acts' and 'verbal

parts of an act,'" in which the statement itself affects the legal rights of the parties or is a

circumstance bearing on conduct affecting their rights." Fed. R. Civ Proc. 801(c), 1972 Adv.

Comm. Notes; see West Coast Truck Lines, Inc. v. Arcata Community Recycling Center, Inc.,

846 F.2d 1239, 1246 n.5 (9th Cir. 1988).  Thus Ms. Moye's consent to search of the briefcase is a

verbal act and is not hearsay.  Plaintiff has not provided any evidence which would controvert

Defendant Silvius's declaration.  The declaration does not seem to contradict any past statement

or testimony by Defendant Silvius.  Based on the consent of Ms. Moye, the searching of the

briefcase did not violate Plaintiff's constitutional rights.

**B. RICO**

The September 29, 2006 Order reinstating Plaintiff's RICO claims only addressed the

issue of RICO standing, reserving Defendants' challenge that Plaintiff failed to state a claim

under Fed. R. Civ. Proc. 12(b)(6) until such time as the parties provided fuller briefing on the

1  issue. Doc. 136, September 29, 2006 Order, at 4:8-12.  Defendants have now done so as part of

2  their motions for summary judgment. See Doc. 142, Defendant Mora's Brief, at 9:6-10:25; Doc.

3  141, Part 2, Bakersfield Defendants' Brief, at 21:14-23:6.  It his opposition, Plaintiff makes no

4  defense of his RICO claims on their face, but instead asks the court for time "to gather essential

5  facts to present evidence to support his civil RICO claims." Doc. 146, Plaintiff's Rule 56(f)

6  Request, at 2:9-11.  A facial challenge for failure to state a claim does not require evidence.

7       To state a civil RICO claim, a plaintiff must demonstrate "(1) conduct (2) of an enterprise

8  (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or

9  property.'" Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir. 2001).  A racketeering activity is, in

10 relevant part, defined as "any act or threat involving murder, kidnapping, gambling, arson,

11 robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or

12 listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable

13 under State law and punishable by imprisonment for more than one year." 18 U.S.C. §1961(1).

14 A pattern of racketeering activity "requires at least two acts of racketeering activity." 18 U.S.C.

15 §1961(5).  "While two acts are necessary, they may not be sufficient." Sedima S.P.R.L. v. Imrex

16 Co., 473 U.S. 479, 497 n.14 (1985).  To constitute "a pattern", a defendant's conduct must be

17 both related and continuous.  H.J. Inc. v. Northwester Bell Telephone Co., 492 U.S. 229, 239

18 (1989).  Civil RICO claims must be plead with specificity Moore v. Kayport Package Express,

19 885 F.2d 531, 541 (9th Cir. 1989).

20      In support of his RICO claim (counts seven and eight) Plaintiff makes general allegations

21 of racketeering activities:

22      attempted murder, extortion, dealing in controlled substances, all chargeable under
        California law as felonies punishable for more than on year in prison, in that the police
23      officer defendants committed extortionate conduct against plaintiff and the members of
        plaintiff's class, and the defendants made false arrests of plaintiff and said class members,
24      planted evidence (including narcotics and weapons violations evidence) on plaintiff and
        said class members and subjected them to extortion, and obstructed justice....The pattern
25      and practice of racketeering activities also included numerous acts of tampering with
        witnesses, victims, and informants under 18 U.S.C. 1512 and retaliating against
26      witnesses, victims, and informants under 18 U.S.C. 1513.

27

28 Amended Complaint, at 10:5-15.  Standing alone, these allegations are insufficient.  Plaintiff's

1  specific factual allegations state:

2     On or about March 27, 1996, while working for the Bakersfield Police Dep't. as part of
      the Kern County Narcotics Enforcement Team, Bakersfield police officer Joseph Mullins
3     contacted both state parole officer Diane Mora, of the California Dep't of Corrections
      (CDC), Bakersfield police officer Silvius, and Kern County deputy sheriff Hood. Mullins
4     falsely told Mora plaintiff was on active parole, Mora told Mullins, Silvius, and Hood and
      directed the latter three to assist her with the arrest of, and to arrest, plaintiff. All four
5     then went to a motel at which plaintiff was a registered guest and: (A) Made warrantless
      and illegal entry into plaintiff's room; (B) Illegally arrested plaintiff; (C) Illegally
6     searched plaintiff; (D) Illegally searched plaintiff's property; and (E) Falsely charged
      plaintiff with the commission of crimes.
7

8  Amended Complaint, at 5:27-6:11.  As far as the court can determine, the only racketeering

9  activity alleged is illegal arrest which may be termed a kidnapping.  "Civil rights violations and

10 injury to reputation do not fall within the statutory definition of 'racketeering activity.'"  Bowen

11 v. Oistead, 125 F.3d 800, 806 (9th Cir. 1997).  As there is only one act that qualifies as

12 racketeering activity, Plaintiff has failed to allege a pattern.

13      Even if Plaintiff did allege a second action against him that qualified as a racketeering

14 activity, it does not appear that Plaintiff can allege a pattern.  In one case, plaintiffs claims of

15 kidnapping, robbery, and extortion by police officers were deemed "insufficient to constitute a

16 pattern of racketeering activity. Defendants' alleged acts are against a single victim or set of

17 victims. The acts are similar, if not identical, and they were only taken over the course of less

18 than a year. The court concludes that the alleged acts do not meet the 'pattern' requirement of

19 RICO." McCormick v. City of Lawrence, 325 F. Supp. 2d 1191, 1209 (D. Kan. 2004).

20      As Plaintiff has failed to state an adequate civil RICO claim, discovery under Fed. R. Civ.

21 Proc. 56(f) is not warranted.

22

23 **C. Monell Liability**

24      Plaintiff alleges Defendant City of Bakersfield has a "custom of improperly indemnifying,

25 and of conspiring to indemnify police officers, for punitive damages assessed against those

26 officers by juries in civil rights cases [and] that practice was a moving force that caused the

27 violations of the plaintiff's rights." Transferred File, Doc. 14, Amended Complaint, at 7:21-24.

28 Plaintiff now does not dispute that "The City of Bakersfield does not maintain a formal or

38

1   informal policy, custom or practice of indemnifying police officers for punitive damages." Doc.

2   149, Plaintiff's Statement of Disputed Material Facts, at 22:7-11.

3

4                                        **V. Conclusion**

5          Defendants' motions for summary judgment or, alternatively, summary adjudication are

6   GRANTED in part and DENIED in part.  The following issues and claims are ADJUDICATED:

7          1. Defendants' initial entry into the motel room violated Plaintiff's constitutional rights.

8   Qualified immunity on this issue can not be determined at this time.

9          2. Defendant Mora's actions in confirming Plaintiff's parole status once he produced his

10  parole discharge card did not violate Plaintiff's constitutional rights.

11         3. Bakersfield Defendants' search of the briefcase did not violate Plaintiff's constitutional

12  rights.

13         4. Plaintiff has failed to state a claim for civil RICO.  Counts seven and eight are

14  dismissed.

15         5. The City of Bakersfield's actions did not give rise to Monell liability.  The City of

16  Bakersfield is dismissed from the case.

17

18         Plaintiff's request for <u>Chuman</u> certification and Fed. R. Civ. Proc. 56(f) discovery are

19  DENIED.

20

21  IT IS SO ORDERED.

22  **Dated:    September 24, 2007             /s/ Anthony W. Ishii**
                                          UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28